**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 25-CR-20443-KMM

| | |
|---|---|
| UNITED STATES OF AMERICA | &#124; |
| Plaintiff, | &#124; |
| v. | &#124; |
| RYAN CLIFFORD GOLDBERG and | &#124; |
| KEVIN TYLER MARTIN, | &#124; |
| Defendants. | &#124; |

**DEFENDANT KEVIN MARTIN'S WRITTEN OBJECTIONS TO THE DRAFT PRESENTENCE INVESTIGATION REPORT UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 32(f)**

Defendant Kevin Tyler Martin, through undersigned counsel and under Federal Rule of Criminal Procedure 32(f), submits the following written objections to the Draft Presentence Investigation Report ("PSR") dated February 5, 2026.[1] These objections identify disputed guideline applications, relevant conduct determinations, and factual assertions that materially affect the advisory guideline range. The government bears the burden of establishing disputed sentencing enhancements by a preponderance of the evidence. An unredacted version of these

---

[1] Certain personal medical and financial details have been redacted to protect privacy. Unredacted copies have been provided to Probation and the Government.

1

objections has been emailed to Probation and the Government under Federal Rule of Criminal Procedure 32(f).

    I.    **OBJECTION TO PARAGRAPH 46 – THREE-LEVEL ENHANCEMENT UNDER U.S.S.G. § 2B3.2(b)(3)(B)**

Paragraph 46 applies a three-level enhancement under U.S.S.G. § 2B3.2(b)(3)(B)(IV) and (V) (2025). Mr. Martin objects.

    A.  <u>Lack of Required Factual Findings</u>

Section 2B3.2(b)(3)(B) applies only if the offense involved product tampering; damage to a computer system used to maintain or operate critical infrastructure; damage to a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security; or where participants otherwise demonstrated the ability to carry out such a qualifying threat.

The Draft PSR does not identify any victim entity that qualifies as "critical infrastructure," nor does it contain findings that any affected system was used in furtherance of national defense, national security, or the administration of justice. The victims described are private commercial entities. No individualized findings establish that § 2B3.2(b)(3)(B)(IV) applies.

Similarly, subsection (V) applies only where participants demonstrated the ability to carry out one of the enumerated threats described in clauses (i)(I) through (V). The PSR does not identify conduct falling within those clauses. The enhancement is applied in conclusory fashion.

Specific offense characteristics must be supported by relevant conduct established by a preponderance of the evidence pursuant to U.S.S.G. § 1B1.3(a). When a defendant objects to an enhancement, the government bears the burden of proving its applicability with reliable evidence.

A sentencing court may not rely on conclusory assertions in a PSR where the defendant has properly objected.

    B.  <u>Structural Misapplication of § 2B3.2(b)(3)(B)</u>

The base offense level under § 2B3.2(a) already accounts for extortion involving threats of injury or serious damage. The loss enhancement under § 2B3.2(b)(2) incorporates § 2B3.1(b)(7). Section 2B3.2(b)(3)(B) is reserved for heightened circumstances involving critical infrastructure or government systems. The Government made no such assertion in its plea negotiations, as reflected by the fact of no mention of any effect on critical infrastructure or this type of enhancement in the plea agreement (Dkt. 62). Standard ransomware encryption of private commercial systems does not, without more, trigger this provision. Absent qualifying infrastructure findings, the three-level increase should be removed.

Because the Draft PSR does not identify qualifying infrastructure, government systems, or conduct demonstrating the ability to carry out a threat of the type contemplated by § 2B3.2(b)(3)(B), the enhancement should be removed.

Mr. Martin respectfully requests that Paragraph 46 be revised to delete the three-level increase under § 2B3.2(b)(3)(B).

    II.    **OBJECTION TO PARAGRAPHS 39 AND 45 – LOSS CALCULATION UNDER §§ 2B3.2(b)(2) AND 2B3.1(b)(7)**

Paragraph 39 attributes an intended loss of $16,300,000 to Mr. Martin. Paragraph 45 applies a seven-level increase under § 2B3.1(b)(7)(H) based on that figure. Mr. Martin objects because the PSR does not establish, with reliable evidence and the analysis required by § 1B1.3, that Mr. Martin is accountable for an "amount demanded" or intended loss totaling $16.3 million.

3

In the Plea Agreement, Mr. Martin agreed that the loss exceeded $9,500,000. (Dkt. 62 ¶ 8 (b)). Thus Mr. Martin has agreed to the seven-point enhancement, what he objects to is the $16,300,000 loss calculation.

    A. <u>Section 2B3.2(b)(2) Does Not Eliminate the Government's Burden to Prove the Amount Demanded and Its Attribution Under § 1B1.3</u>

Section 2B3.2(b)(2) directs the Court to use the greater of the "amount demanded" or the "loss to the victim," and it cross-references the loss table in § 2B3.1(b)(7) to determine the number of levels to increase. But the fact that § 2B3.2(b)(2) permits reliance on an "amount demanded" does not relieve the government of its burden to establish (i) what amounts were actually demanded, and (ii) that those amounts are properly attributable to Mr. Martin as relevant conduct under § 1B1.3. The Guidelines' relevant conduct rule is the gateway for holding a defendant accountable for the acts of others in a conspiracy, and § 1B1.3(a)(1)(B) requires an express finding that the conduct was within the scope of the jointly undertaken criminal activity, in furtherance of that activity, and reasonably foreseeable to the defendant.

Here, the PSR states in conclusory fashion that Mr. Martin (along with others) is accountable for an intended loss of $16,300,000, but it does not provide the analysis that § 1B1.3 requires, particularly the critical distinction between (1) the overall conspiracy alleged and (2) the "jointly undertaken criminal activity" attributable to the individual defendant for guideline purposes. Without that individualized § 1B1.3 analysis, the PSR's aggregate figure is not sufficiently supported.

B. <u>The PSR Does Not Provide a Reliable Evidentiary Foundation for the $16.3 Million Figure or Identify the Supporting Record Materials</u>

Even assuming "amount demanded" can supply the loss metric in an extortion guideline, the PSR must still identify the evidentiary basis for the number adopted. Paragraph 39 asserts a total of $16.3 million, but the PSR provides no documentation, no exhibit citations, no contemporaneous negotiation records, no panel logs, and no victim communications establishing the specific demands used to build that total.

For several alleged victims, the PSR acknowledges that no ransom was paid and that no additional information has been provided regarding the actual losses sustained. That concession underscores the need for careful sourcing and individualized findings before the PSR can convert unparticularized "demands" into an inflated loss figure that does not reflect actual loss.

The PSR identifies only one concrete paid ransom of approximately $1,274,000. For the other alleged victims, the PSR describes demands at a high level but does not document whether the stated figures reflect (1) an initial anchor figure, (2) a negotiated number, (3) a figure communicated by which conspirator, (4) a figure Mr. Martin knew of, agreed to pursue, or adopted as a shared objective, or (5) a figure that can be shown to be within the scope of Mr. Martin's jointly undertaken activity as required by § 1B1.3(a)(1)(B).

C. <u>The PSR Fails to Apply § 1B1.3's Scope, Furtherance, and Foreseeability Requirements to the Alleged "Demanded" Amounts</u>

Paragraphs 39 and 45 effectively treat the total "intended loss" as a collective number automatically attributable to each participant. That is not the § 1B1.3 standard. Under §

5

1B1.3(a)(1)(B), attribution is not automatic even in a conspiracy. The Court must determine what criminal activity the defendant agreed to jointly undertake, and then determine whether the amounts the PSR aggregates were within that scope, in furtherance of it, and reasonably foreseeable.

The PSR does not make those findings. It does not separate the defendant's particular agreement and role from the broader conduct of others. It does not identify which specific "amount demanded" communications are attributable to Mr. Martin as his own acts, versus acts of co-participants. It does not make findings that Mr. Martin knew of, endorsed, or shared the objective of extracting the specific figures used to reach $16.3 million. Absent those findings, the $16.3 million figure is not properly supported as relevant conduct for guideline purposes.

D. <u>Requested Remedy</u>

Mr. Martin respectfully requests that Probation revise Paragraphs 39 and 45 to (1) identify the evidence supporting each alleged "amount demanded," including the source materials establishing what was actually demanded in each incident; (2) perform the required § 1B1.3(a)(1)(B) analysis into the scope of jointly undertaken criminal activity, furtherance, and reasonable foreseeability as to any amounts attributed to Mr. Martin based on the acts of others exceeding the $9,500,000 loss amount agreed to in the Plea Agreement, or leave the language of the Plea Agreement as is in regards to the Plea Agreement in regards to the loss amount.

### III. OBJECTION TO RELEVANT CONDUCT CHARACTERIZATIONS (PARAGRAPHS 28, 29, 36)

Mr. Martin objects to the characterizations of his role in Paragraphs 28, 29, and 36 to the extent those paragraphs overstate his authority, independence, and decision-making power within the conspiracy and fail to accurately reflect the shared and evolving nature of responsibilities among participants.

Mr. Martin does not dispute that he participated in deploying ransomware and exfiltrating data. However, the PSR's narrative risks conveying the impression that he exercised primary technical control or operational authority that he did not possess.

A. <u>Failure to Distinguish Technical Participation from Strategic Control</u>

Paragraphs 28 and 29 describe defined roles within the group, and Paragraph 36 references statements attributed to a codefendant concerning those roles. While the group initially divided responsibilities based on skill sets, those roles evolved and were not exclusive. Ransomware deployment and data exfiltration were shared functions among participants, not tasks uniquely or independently controlled by Mr. Martin.

Importantly, Mr. Martin did not: (1) Conduct vulnerability scanning to identify targets; (2) Select or approve victim companies; (3) Exercise final authority over whether a target would be pursued; (4) Set final ransom demand amounts; (5) Control ransom negotiations; or (6) Control cryptocurrency wallets or the movement and laundering of funds.

Target approval and ransom strategy decisions rested primarily with another participant. Mr. Martin's involvement in negotiations was limited to reviewing communications and relaying information; he did not direct negotiation strategy or determine payment thresholds. Absent clarification, the PSR's description risks overstating Mr. Martin's relative culpability by conflating technical execution with strategic authority.

B.  <u>Section 1B1.3 Requires Individualized Scope Findings</u>

Under § 1B1.3(a)(1)(B), relevant conduct in a jointly undertaken criminal activity requires an individualized determination of the scope of the criminal activity the defendant agreed to undertake. Participation in a conspiracy does not automatically equate to control over all aspects of the operation.

The PSR does not clearly distinguish between (1) the broader structure of the conspiracy and (2) the specific scope of Mr. Martin's agreed-upon conduct. While he participated in technical deployment activities, he did not exercise overarching operational control or decision-making authority. Without that distinction, the narrative may inadvertently inflate his role beyond the scope required under § 1B1.3.

C.  <u>Reliance on Codefendant Statements</u>

Paragraph 36 appears to reflect post-arrest statements of a co-defendant describing assigned roles. While hearsay may be considered at sentencing, due process requires that such statements possess sufficient indicia of reliability. Where those statements suggest fixed and exclusive role assignments, they should be evaluated in context.

8

The evidence reflects that responsibilities were collaborative and evolved over time. To the extent the PSR relies on static characterizations drawn from a codefendant's statements, it should clarify that technical tasks were shared and that strategic authority did not rest with Mr. Martin.

    D. <u>Requested Clarification</u>

Mr. Martin respectfully requests that the PSR be revised to clarify that ransomware deployment and data exfiltration were shared responsibilities among participants, that Mr. Martin did not identify or approve victims, that he did not control ransom negotiation strategy, set final ransom amounts independently, or control cryptocurrency wallets, or distinguish between technical participation and strategic or managerial authority.

These revisions are necessary to ensure that the Court's assessment of Mr. Martin's culpability accurately reflects the scope of his conduct under § 1B1.3 and does not attribute to him authority or control he did not possess.

### IV. PRESERVATION OF OBJECTIONS TO RESTITUTION AND FINANCIAL FINDINGS

The PSR acknowledges that restitution amounts have not yet been determined. Mr. Martin reserves objection to any restitution calculation not supported by documentary evidence as required by 18 U.S.C. § 3664. Restitution must be proven by a preponderance of the evidence and may not be speculative.

## V. ACCEPTED ADJUSTMENTS

Mr. Martin does not object to the reductions under § 3E1.1 or § 4C1.1 and respectfully requests that those reductions remain applied.

## VI. MATERIAL FACTUAL CORRECTIONS NECESSARY FOR ACCURACY OF THE RECORD

In addition to the guideline objections set forth above, Mr. Martin respectfully requests that the Probation Office correct several factual inaccuracies and material misstatements contained in the Draft Presentence Investigation Report. Accuracy in the PSR is critical not only for sentencing purposes, but also for Bureau of Prisons classification, designation, and programming decisions. As currently written, portions of the report misstate or incompletely describe material facts relating to Mr. Martin's surrender, bond conditions, personal history, medical condition, and financial circumstances.

Mr. Martin voluntarily surrendered to the United States Marshals in Miami after purchasing his own ticket and presenting himself without incident. After the FBI searched his house, Mr. Martin retained counsel, through which he negotiated his voluntary surrender. The Identifying Data section further reflects on page 3 "DNA Collected: No," when Mr. Martin's DNA was in fact collected at the time of surrender. Additionally, the description of his pretrial conditions at ¶ 11 does not reflect the Court's subsequent modification order, and inaccurately characterizes the scope of certain restrictions. The PSR should be revised to reflect that Mr. Martin is authorized to travel within the Eastern and Northern Districts of Texas in addition to the Southern District of Florida; that he is permitted reasonable and lawful use of computers, smartphones, and internet-enabled devices for employment, communication with counsel, and

10

daily living; and that the restrictions imposed are limited to working in cybersecurity and possessing login credentials of individuals other than himself and his partner.

Second, the report contains biographical and medical inaccuracies that warrant correction. The PSR lists at ¶ 64 Mr. Martin's father as employed by the postal service, when he is employed by Lockheed Martin. The PSR states at ¶ 67 that Mr. Martin lived with his maternal grandmother following his parents' divorce, when in fact both he and his mother resided with the maternal grandmother. The report states at ¶ 71 that Mr. Martin sold a Sig-Sauer pistol upon indictment, when in fact all firearms were sold days after the FBI's visit to his home in June, prior to indictment and arrest, and the name of the purchaser is incorrect. The PSR also inaccurately describes his tattoos at ¶ 72 and should be corrected to reflect that he has a sleeve only on his left arm and that his chest tattoo is a death's-head hawkmoth, a moth species of the genus Acherontia, not "mother death" as is currently reflected in the PSR.

The medical section similarly requires clarification. [redacted]



Mr. Martin respectfully requests that the Probation Office revise the PSR to ensure that it accurately reflects the record and his personal, medical, and financial circumstances prior to final submission to the Court.

WHEREFORE, Defendant Kevin Tyler Martin respectfully requests that the Draft Presentence Investigation Report be revised consistent with these objections and that any unresolved disputes be set forth in the Addendum for determination pursuant to Rule 32(i)(3)(B).

Respectfully submitted,

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
Tor Ekeland Law, PLLC
30 Wall St., 8th Floor
New York, NY 10005
t: (718) 737 - 7264
tor@torekeland.com

*Pro Hac Vice Counsel for Defendant Kevin Martin*

/s/ William Aaron Daniel
William Aaron Daniel (FL Bar No. 99739)
Asymmetric Legal
11900 Biscayne Blvd., Suite 400
Miami, FL
t: (305) 979 - 9296
f: (718) 504 - 5417
aaron@asymmetric.legal

*Designated Local Counsel for Defendant Kevin Martin*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2026, I electronically filed the above Objections to the Draft Presentence Investigation Report with the Clerk of Court using CM/ECF.

<u>/s/ William Aaron Daniel</u>