**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 25-CR-20443-KMM

UNITED STATES OF AMERICA

     Plaintiff,

    v.

RYAN CLIFFORD GOLDBERG and
KEVIN TYLER MARTIN,

     Defendants.

_____

## DEFENDANT KEVIN MARTIN'S SENTENCING MEMORANDUM

Kevin Tyler Martin appears before the Court accepting responsibility for serious criminal conduct. He does not minimize the offense. On or about April 3, 2025, upon the arrest of Co-Conspirator #1, Mr. Martin first learned of the government's investigation. As soon as he learned of the charges, he retained counsel and contacted the government. He made no attempt to flee or avoid responsibility. Since his initial appearance on October 14, 2025, he has remained on pretrial release, in compliance with the conditions imposed by this Court and pretrial services. On December 18, 2025, he pleaded guilty. The question before the Court is what sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a). Mr. Martin submits that a three-year sentence of supervised release, forfeiture in the amount of $324,123.26 (the total Mr. Martin received from his role), a special assessment of

1

$100.00, and restitution as determined by the Court, is sufficient given his quick acceptance of responsibility, his lack of criminal history, his cooperation with the government, and the other factors discussed below.

This sentence is within the statutory range and this Court's discretion. Under 18 U.S.C. § 3553(a) this Court makes an individualized assessment based on the facts of the case and the statutory factors set out in § 3553(a).[1] There is no presumption the Guidelines are reasonable, and they are not mandatory.[2]

Mr. Martin pleaded guilty to Count One, conspiracy to interfere with commerce by extortion, in violation of 18 U.S.C. § 1951(a).[3] That offense carries no mandatory minimum term of imprisonment and a statutory maximum of twenty years' imprisonment, followed by up to three years of supervised release.[4] The Presentence Report ("PSR") calculates an advisory imprisonment range of 57 to 71 months based on a total offense level of 25 and Criminal History Category I.[5] That calculation includes a three-level increase under U.S.S.G. § 2B3.2(b)(3)(B)(iv),

---

[1] *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

[2] *See Rita v. United States*, 551 U.S. 338, 351 (2007).

[3] Dkt. 62, p. 1 (Dec. 18, 2025).

[4] *Id.* at 2.

[5] Dkt. 80, Sealed PSR ¶ 98.

(v), which Mr. Martin disputes.[6] Under the plea agreement, the jointly recommended calculations yield an adjusted offense level of 22.[7] The parties agreed that the Government may seek additional enhancements and that the Defendant may seek a downward departure or variance.[8]

In its objections to the PSR, and in its Sentencing Memo, the government asks the Court to add two two-level victim-related enhancements under §§ 3A1.1(b)(1) and (b)(2), arguing both that Mr. Martin knew or should have known that a victim was vulnerable and that the offense involved a large number of vulnerable victims.[9] Probation declined to include the two two-level enhancements in its PSR recommendations. If the Court were to adopt the government's proposed additional four-level vulnerable-victim enhancement, the total offense level would become 26, which at Criminal History Category I yields an advisory imprisonment range of 63 to 78 months. The government's proposed vulnerable-victim enhancement is also the basis for its effort to deny Mr. Martin the two-level reduction under § 4C1.1. This would put his total offense level at 28, which yields an advisory range of 78-97 months. The government's calculations seem to contain an error, adding an extra point to the two points agreed upon in the Plea Agreement related to §

---

[6] *Id.* ¶ 46.

[7] Dkt. 62, p. 3-4 (Dec. 18, 2025).

[8] *Id.*

[9] Dkt. 76, p. 5-6 (Feb. 19, 2026).

3B1.1, yielding a Guidelines calculation of 29 and a recommended term of 87-108 months.[10] But because §§ 3A1.1(b)(1) and (b)(2) do not apply, there is no basis to disturb Probation's correct application of the zero-point offender reduction. As discussed below, both the government's proposed four-level victim-related enhancement under §§ 3A1.1(b)(1) and (b)(2), and the PSR's three-level increase under § 2B3.2(b)(3)(B)(iv), (v), are not justified under the Guidelines.

This is a serious offense, but not every serious offense requires imprisonment. Here, the advisory range is driven primarily by intended loss and guideline mechanics rather than by violence, recidivism, obstruction, or any evidence that Mr. Martin cannot be safely supervised in the community. Even assuming the advisory range is correctly calculated, the Guidelines do not answer the ultimate question. The Court must impose a sentence sufficient, but not greater than necessary, based on the individual defendant before it.

Even if the Court adopts the proposed range, a downward variance is warranted because the Guidelines' calculation overstates Mr. Martin's personal culpability, gives outsized weight to intended loss, and does not adequately account for his history, his zero-point offender status, his military service, his medical condition, his acceptance of responsibility, his demonstrated compliance on pretrial release, and his compassionate and caring character as evidenced by the

---

[10] *Compare* Dkt. 62, p. 4 ¶ 8(d), *with* Dkt. 93, p. 6.

attached letters written to the Court on his behalf (attached as Exhibit A). To the extent the government's joint filing references aggravating conduct unique to Mr. Goldberg, including flight, those facts have no bearing on Mr. Martin, who surrendered and has remained compliant on release.

The government's Sentencing Memo materially overstates the proper Guidelines calculation and the factual record as to Mr. Martin.[11] Its Guidelines table assigns three levels under § 3B1.3, even though the plea agreement provides for only a two-level increase, and its vulnerable-victim theory is also the basis for its effort to eliminate the § 4C1.1 zero-point reduction.[12] The government further relies on aggravating facts unique to Mr. Goldberg, broad policy assertions about "corroding" trust in an industry, and investigative descriptions that go beyond the facts Mr. Martin admitted in the plea materials. None of that justifies the enhancements the government seeks or a custodial sentence.

The government argues that incarceration is warranted because one of the targeted companies was a medical facility, and the offense therefore involved "vulnerable victims." But neither the law nor the record support this characterization. As Probation's PSR addendum

---

[11] Dkt. 93, p. 5 (Apr. 23, 2026).

[12] *See* Dkt. 62, p. 4 ¶ 8(d).

5

reflects, Probation rejects the proposed § 3A1.1 enhancements because the government did not show that Mr. Martin knew or should have known that any patient was a vulnerable victim within the meaning of the Guidelines. As the PSR notes, "[t]he vulnerable victim guideline is primarily concerned with the impaired capacity of the victim to detect or prevent the crime, rather than with the quantity of harm suffered by the victim."[13] The charged conduct was directed at business entities, and the present record does not establish that Mr. Martin knew or should have known of any unusually vulnerable individual victim within the meaning of § 3A1.1. The government's reliance on *Duran* is inapposite because that case involved elderly dementia patients.[14] The government's vulnerable-victim theory therefore does not change the core question before the Court: what sentence is sufficient, but not greater than necessary, for Mr. Martin.

This requires close examination of the charge pleaded to. Martin pleaded guilty to conspiracy to interfere with commerce by extortion under 18 U.S.C. § 1951(a), an offense that carries no mandatory minimum term of imprisonment. Congress thus left room for the Court to impose a non-custodial sentence in the appropriate case. This is an unusual case in which a non-custodial sentence can satisfy the purposes of sentencing. Where, as here, the statute imposes no

---

[13] Dkt. 86, Sealed Addendum to PSR p. 1.

[14] *See United States v. Duran*, 620 F. App'x 687, 689 (11th Cir. 2013)*,* Dkt. 86, Sealed Addendum to the PSR at 1.

mandatory prison term and the § 3553(a) factors demonstrate that supervised release will adequately serve the purposes of sentencing, the Court may exercise its discretion to impose a sentence grounded on supervised release rather than incarceration. A three-year sentence of supervised release would still be a serious federal sentence, would preserve accountability, and would satisfy the statutory command that the punishment imposed be sufficient, but not greater than necessary.

## STATEMENT OF FACTS

On December 18, 2025, Mr. Martin pleaded guilty to Count One under a written plea agreement and adopted a factual proffer.[15] In that agreement, the parties jointly agreed that the base offense level was 18 under U.S.S.G. § 2B3.2(a); that the loss amount exceeded $9,500,000, yielding a seven-level increase under § 2B3.1(b)(7)(H); that no role adjustment under §§ 3B1.1 or 3B1.2 applied; that § 3B1.3 applied; and that the government could recommend additional enhancements while Mr. Martin remained free to seek a departure or variance, and preserved his right to appeal.[16] The agreement also provided for a forfeiture money judgment of $324,123.26.

---

[15] Dkt. 62, p. 1 (Dec. 18, 2025); Dkt. 63 (Dec 18, 2025).

[16] Dkt. 62, p. 3-5 (Dec. 18, 2025).

Mr. Martin did not create or operate the BlackCat/ALPHV platform. He and co-defendants were affiliate users of the platform. The factual proffer describes the BlackCat/ALPHV ransomware platform as an affiliate-based system in which a BlackCat administrator provided affiliates access to the ransomware infrastructure and typically received twenty percent of any ransom payment, with the remaining share going to the affiliate actors. According to the proffer, Mr. Martin, co-defendant Ryan Goldberg, and a Co-Conspirator #1 used that access to target five entities between May and November 2023.

Only one company paid a ransom. A medical device company paid approximately 44.811 bitcoin, worth approximately $1.2 million at the time, in exchange for a decryptor and a promise that its data would not be published online.[17] Consistent with the affiliate arrangement, approximately twenty percent of that payment went to the BlackCat administrator, and the remaining proceeds were divided equally among the three participants, leaving Mr. Martin with approximately 12.243 bitcoin, then valued at approximately $324,123.26.[18] By contrast, the remaining identified incidents described in the factual proffer involved ransom demands made to other companies, but no ransom payments were made.[19]

––––––––––––––––––––––

[17] Dkt. 63, p. 5 (Dec. 18, 2025).

[18] *Id.*

[19] *Id.* at 4, 5.

## I.   A SENTENCE OF 3 YEARS SUPERVISED RELEASE IS WARRANTED

Courts recognize supervised release as appropriate in a serious economic-crime case when, as here, the advisory range is driven by loss calculations that overstate individual culpability, along with other factors that the district court uses in its careful, individualized assessment under § 3553(a).[20] These decisions demonstrate that where the Guidelines range does not fairly capture the defendant's actual role, history, characteristics, and risk of recidivism, a district court acts well within its discretion in imposing a non-custodial sentence.

### A.   The Loss Numbers Do Not Accurately Reflect Culpability

The intended-loss figure is a blunt proxy that materially overstates Mr. Martin's personal gain, role, and need for incapacitation. Mr. Martin did not create, manage, or control the BlackCat/ALPHV platform. He participated as an affiliate within a broader structure operated by others. The factual proffer reflects that the BlackCat administrator controlled the platform and received a percentage of ransom proceeds before any remaining funds were divided among participants. Although the advisory range is heavily influenced by intended loss, the actual paid

---

[20] *See United States v. Prosperi*, 686 F.3d 32, 48–50 (1st Cir. 2012) (affirming probationary sentences in a major fraud case where the district court concluded that the loss-driven Guidelines range overstated culpability); *United States v. Tomko*, 562 F.3d 558, 560–61, 567–68, 574 (3d Cir. 2009) (*en banc)* (affirming sentence of probation, home detention, community service, restitution, and a statutory-maximum fine in a tax-evasion case despite an advisory range of 12 to 18 months); *United States v. Warner*, 792 F.3d 847, 850–51, 861–66 (7th Cir. 2015) (affirming two years' probation and community service in a tax-evasion case with an advisory range of 46 to 57 months based on the district court's individualized weighing of the § 3553(a) factors).

ransom identified in the record was approximately $1.2 million, and Mr. Martin's personal share was approximately $324,123.26. Under § 3553(a), that distinction matters for proportionality. A sentence driven primarily by a large intended-loss figure risks overstating his actual role and treating him as though he were running the operation itself.[21]

In economic and extortion cases, loss can exert a disproportionate influence on the advisory range without adequately capturing personal culpability.[22] The Supreme Court has made clear that district courts are justified in varying from the Guidelines where the advisory range does not yield a sentence that fits the individual defendant and the purposes of sentencing.[23]

## II.     MR. MARTIN ACCEPTED RESPONSIBILITY EARLY AND FULLY

Mr. Martin never attempted to flee or avoid responsibility. He pleaded guilty, adopted the factual proffer, and spared the government and the Court the burden of trial. The PSR recognizes that he clearly demonstrated acceptance of responsibility and applies the reduction under U.S.S.G.

--------

[21] *See Prosperi*, 686 F.3d at 50 (1st Cir. 2012) (approving the district court's conclusion that the loss amount was an unfair proxy for culpability and affirming probationary sentences); *see also United States v. Howe*, 543 F.3d 128 (3d Cir. 2008); *Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).

[22] *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding for the district court to consider a non-Guidelines sentence where the "significant effect of the loss enhancement," relative to the low base offense level, drove the advisory range); *Prosperi*, 686 F.3d at 39–40 (1st Cir. 2012) (affirming probationary sentences in a major fraud case where the district court concluded that the loss figure did not fairly reflect the defendants' culpability and would not allow the loss estimate to "unduly drive" the sentencing decision).

[23] *See Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

§ 3E1.1. The plea agreement also contemplated the government's motion for the additional one-level reduction under U.S.S.G. § 3E1.1(b), and the PSR applies that adjustment.[24] Mr. Martin also has offered his full cooperation to the government as reflected in the Plea Agreement.[25]

Mr. Martin's acceptance of responsibility was not merely formal. He has remained compliant on release. The PSR reports that he was released on a $400,000 personal surety bond co-signed by his mother, surrendered his passport, and remained in compliance with all conditions of pretrial release while under courtesy supervision in the Eastern District of Texas and monitoring in the Southern District of Florida.[26] That record of compliance strongly indicates that Mr. Martin can be safely and effectively supervised in the community.

The plea agreement also includes a forfeiture money judgment of $324,123.26, representing the value of proceeds traceable to Count One. That forfeiture is a meaningful form of punishment and should be considered as part of the total sanction imposed.

_____

[24] Dkt. 62, p. 3 (Dec. 18, 2025); Dkt. 80, Sealed PSR ¶ 52.

[25] Dkt. 62, p. 5 (Dec. 18, 2025).

[26] Dkt. 80, Sealed PSR ¶ 11, 13.

11

## III.   THE VULNERABLE VICTIM ENHANCEMENT DOES NOT APPLY

This Court, like Probation, should reject any attempt to apply the four-level vulnerable-victim enhancements sought by the government under U.S.S.G. § 3A1.1(b)(1) & (2). The vulnerable-victim enhancement applies only if a victim of the offense was unusually vulnerable or otherwise particularly susceptible to the criminal conduct, and the defendant knew or should have known of that unusual vulnerability. [27] There is no evidence in the record demonstrating any unusual vulnerability of any victim. Under Eleventh Circuit law, the inquiry is highly fact specific.

The standard is not met here. The offense conduct admitted in the plea materials and described in the factual proffer and PSR involves ransomware attacks on a manufacturer, a medical-device company, a doctor's office, a pharmaceutical company, and an engineering

---

[27] *See United States v. Long*, 935 F.2d 1207, 1210–11 (11th Cir. 1991) (explaining that § 3A1.1 is intended to enhance punishment where the defendant selected the victim because of the victim's perceived susceptibility to the offense); *United States v. Davis*, 967 F.2d 516, 524–25 (11th Cir. 1992) (holding that the vulnerability must be an "unusual" vulnerability present in only some victims of that type of crime, not the ordinary susceptibility inherent in the offense); *United States v. Morrill*, 984 F.2d 1136, 1137–38 (11th Cir. 1993) (*en banc*) (rejecting a class-based approach and holding that the enhancement turns on whether the particular victim possessed unique characteristics making that victim more vulnerable than the ordinary victim of the crime); *United States v. Arguedas*, 86 F.3d 1054, 1057–58 (11th Cir. 1996) (affirming the enhancement where the defendant befriended and then targeted a pastor and his financially struggling church after learning of their particular susceptibility to the fraud); *United States v. Malone*, 78 F.3d 518, 521–23 (11th Cir. 1996) (affirming the enhancement where the defendants specifically targeted a dispatched cab driver, knowing his professional obligations made him more vulnerable to the offense than other drivers); *United States v. Day*, 405 F.3d 1293, 1295–96 (11th Cir. 2005) (holding that the enhancement applies when the defendant selects victims due to their perceived vulnerability and finding repeated solicitation evidence of such susceptibility in a fraud scheme).

company, not the deliberate selection of unusually vulnerable natural persons. The offense, as charged and admitted, was directed at entities engaged in interstate commerce and at causing those entities to fear financial loss. This is a far cry from the type of case in which § 3A1.1 applies, where a victim's unusual vulnerability is essential to the crime.

The government argues that Victim 3 was especially susceptible to extortion because it was a doctor's office that held sensitive patient photographs, and it points to leak-site posts and negotiation messages referencing those images after the practice refused to pay ransom.[28] But that still does not establish the enhancement. The factual proffer establishes only that Victim 3 was a doctor's office, that a ransom was demanded, and that sensitive patient photos were later published on the leak site (that the government shut down).[29] The government has not produced the photos themselves, and without them there is no basis to assess whether they reveal any unusual vulnerability. Additionally, there is no basis for determining from the record that there was a large number of vulnerable victims.[30] From the fact that the photos were sensitive, it does not follow that they manifested an unusual vulnerability, something not agreed to in the Plea

_____

[28] Dkt. 93, p. 5 (Apr. 23, 2026).

[29] Dkt. 63, p. 2 (Dec. 18, 2025); In December 2023, DOJ shut down the leak site: Press Release, DOJ, *Justice Department Disrupts Prolific ALPHV/Blackcat Ransomware Variant* (Dec. 19, 2023), (available at: https://www.justice.gov/archives/opa/pr/justice-department-disrupts-prolific-alphvblackcat-ransomware-variant).

[30] § 3A1.1(b)(1) adds a two-point enhancement for vulnerable victim, and § 3A1.1(b)(2) adds a two-point enhancement for a large number of vulnerable victims. The government argues that the two-point reduction under § 4C1.1 does not apply because of §3A1.1(b)(2). *See* Gov't Sentencing Mem., Dkt. 93, p. 4.

Agreement. It does not establish that Mr. Martin and his co-defendants selected Victim 3 because of the unusual vulnerability of any particular patient, that they knew or should have known which specific individuals were supposedly vulnerable, or that they exploited any such vulnerability within the meaning of § 3A1.1. To the extent the government relies on investigative materials, negotiation excerpts, or descriptions of a file tree to argue that the conspirators reviewed and subjectively understood the nature of the stolen data, those are not facts Mr. Martin admitted in the factual proffer and should not be treated as such for purposes of § 3A1.1.

The question is not whether the offense involved sensitive material or caused serious downstream harm. It is whether any victim was unusually vulnerable or particularly susceptible to the offense and whether Mr. Martin and his co-defendants knew or should have known of that vulnerability at the time of the offense conduct. The present record does not make that showing. At most, it shows they targeted a business entity that possessed sensitive information and an effort to use the threatened disclosure of that information as leverage. That is not enough to support § 3A1.1.

Section 3A1.1 is a narrow enhancement for unusual vulnerability, not a catch-all for serious or sympathetic harm. The Eleventh Circuit has repeatedly rejected sweeping presumptions and required a case-specific showing that the victim was more vulnerable than the ordinary victim

14

of that offense.[31] The older cases sometimes framed the inquiry in terms of whether a defendant selected the victim because of perceived susceptibility.[32] The Eleventh Circuit has since clarified that the enhancement does not invariably require proof of targeting, but it still requires proof that the defendant knew or should have known of an unusual vulnerability.[33] In the cases applying the enhancement, the focus has been on identifiable natural persons.[34]

Here, there is no comparable showing. The charged conduct pleaded to was directed at institutions for economic gain, and the government has not shown, nor does the Factual Proffer agreed to by the government reflect, that Mr. Martin knew or should have known that when the doctor's office was targeted any particular natural person was unusually vulnerable within the meaning of § 3A1.1. Nor can the enhancement be justified by after-the-fact consequences, such as the later-identified sensitivity of stolen data or downstream effects on patients, without proof that those alleged vulnerabilities were known or should have been known to Mr. Martin in connection

---

[31] See *Davis*, 967 F.2d 524–25 (11th Cir. 1992); *Morrill*, 984 F.2d 1137–38 (11th Cir. 1993) (*en banc*).

[32] *See United States v. Page*, 69 F.3d 482, 488–90 (11th Cir. 1995); *United States v. Phillips*, 287 F.3d 1053, 1056–58 (11th Cir. 2002); *Malone*, 78 F.3d 521–23 (11th Cir. 1996).

[33] *See United States v. Birge*, 830 F.3d 1229, 1231–35 (11th Cir. 2016).

[34] *See Birge*, 830 F.3d at 1231–35; *United States v. Moran*, 778 F.3d 942, 978–79 (11th Cir. 2015); *United States v. Bradley*, 644 F.3d 1213, 1287–89 (11th Cir. 2011); *United States v. Day*, 405 F.3d 1293, 1295–96 (11th Cir. 2005); *Phillips*, 287 F.3d at 1056–58.

with the offense conduct.[35] To the extent the government argues that medical practices or companies holding sensitive information are inherently "vulnerable," that is precisely the sort of categorical reasoning the Eleventh Circuit has rejected.[36] A ransomware extortion directed at an entity that stores confidential data may be serious and harmful, but seriousness is not the § 3A1.1 test. Probation correctly declined to apply the enhancement, and the Court should do the same.

## IV.     THE THREE-LEVEL ENHANCEMENT UNDER § 2B3.2(b)(3)(B)(iv), (v) DOES NOT APPLY

The PSR seeks a three-level increase under U.S.S.G. § 2B3.2(b)(3)(B)(iv), (v) that the government's Sentencing Memo does not seek. The PSR seeks a three-level increase under U.S.S.G. § 2B3.2(b)(3)(B)(iv), (v) that even the government's sentencing memorandum does not pursue. The Court should reject that enhancement. The record does not establish product tampering, does not establish damage to a computer system used to maintain or operate critical infrastructure or used by or for a government entity in furtherance of the administration of justice, national defense, or national security, and does not establish that Mr. Martin "otherwise demonstrated the ability to carry out" any such aggravated threat.

———————————————

[35] *See Birge*, 830 F.3d at 1231–35; *Page*, 69 F.3d at 489; *Phillips*, 287 F.3d at 1056–57.

[36] *See Morrill*, 984 F.2d at 1137–38; *United States v. Long*, 935 F.2d 1210–11.

16

A.  The Record Does Not Establish "Product Tampering" Under § 2B3.2(b)(3)(B)(iv)

The enhancement cannot be sustained under § 2B3.2(b)(3)(B)(iv) because the record does not establish product tampering. The factual proffer describes ransomware attacks, data theft, server encryption, ransom demands, and, in one instance, the publication of data after a victim refused to pay.[37] That is serious conduct, but it is not product tampering.

In ordinary legal usage, and in the Guideline context, "product tampering" refers to interference with a product itself, such as contamination, adulteration, poisoning, or comparable conduct affecting the integrity or safety of a product placed into commerce.[38] Nothing in the plea agreement or factual proffer alleges that Mr. Martin or his co-defendants altered, contaminated, poisoned, or otherwise tampered with any product.[39]

Nor does the publication of data on the BlackCat leak site change that analysis. At most, that fact shows the conspirators were able to carry out a threat to publish stolen data after nonpayment. But publication of stolen data is not "product tampering." The enhancement's text is narrower, and the Court should not expand it beyond its terms. Because the admitted conduct

---

[37] Dkt. 63 (Dec 18, 2025).

[38] *See United States v. Hummer*, 916 F.2d 186, 194 (4th Cir. 1990) (treating threats to poison consumer products as extraordinary extortion conduct involving product tampering and grave public-safety risk).

[39] Dkt. 62 (Dec 18, 2025); Dkt. 63 (Dec 18, 2025).

involves cyber extortion, not interference with any product, the § 2B3.2(b)(3)(B)(iv) enhancement does not apply.

B. The Record Does Not Establish Damage to a Qualifying Computer System Under § 2B3.2(b)(3)(B)(v)

The enhancement likewise cannot be sustained under § 2B3.2(b)(3)(B)(v). Subsection (v) is limited to "damage to a computer system used to maintain or operate critical infrastructure, or used by or for a government entity in furtherance of the administration of justice, national defense, or national security".[40] The plea materials establish neither.

The factual proffer identifies five victims, all private-sector entities.[41] The proffer does not identify any victim as a government entity. It does not state that any targeted network was used by or for a government entity in furtherance of the administration of justice, national defense, or national security. And it does not state that any attacked system was used to maintain or operate "critical infrastructure" within the meaning of the Guideline.[42]

That omission is dispositive. The fact that Victim 5 was "a manufacturer of unmanned aerial systems engaged in interstate commerce" does not, by itself, bring this case within §

_____

[40] USSG § 2B3.2(b)(3)(B)(v).

[41] Dkt. 62 (Dec 18, 2025); Dkt. 63 (Dec 18, 2025).

[42] *Id.*

18

2B3.2(b)(3)(B)(v).[43] The factual proffer identifies Victim 5 only as a private commercial manufacturer; it does not state that Victim 5 was a government entity, that the system in question was used by or for a government entity, or that the system was used in furtherance of the administration of justice, national defense, or national security.[44] Nor does the proffer state that the attacked system was used to maintain or operate critical infrastructure within the meaning of the Guideline. The Sentencing Commission chose specific limiting language, and the Court should enforce it as written.

The same is true of the phrase "otherwise demonstrated the ability to carry out" "damage to a computer system used to maintain or operate critical infrastructure, or used by or for a government entity in furtherance of the administration of justice, national defense, or national security".[45] Even if the conspiracy demonstrated an ability to compromise Victim 5's network, subsection (v) requires more than proof of cyber capability against a private business. It requires proof tied to the specific aggravated threat described in that subsection, "damage to a computer system used to maintain or operate critical infrastructure, or used by or for a government entity in

---

[43] Dkt. 63, p. 5 (Dec 18, 2025).

[44] Dkt. 63, p. 5-6 (Dec 18, 2025).

[45] USSG § 2B3.2(b)(3)(B)(v).

furtherance of the administration of justice, national defense, or national security".[46] Courts

applying the demonstrated ability language have required concrete facts showing the ability to

carry out the particular threatened harm.[47] No such proof exists here as to any qualifying system

covered by subsection (v), and certainly none as to Victim 5.

Because the record does not establish either a qualifying system or an ability to carry out

the specific aggravated threat described in subsection (v), the three-level increase should be

rejected.

### V.      MR. MARTIN IS A TRUE ZERO-POINT OFFENDER WITH NO PRIOR CRIMINAL HISTORY

Mr. Martin has no criminal history points and no prior adult convictions. The PSR places

him in Criminal History Category I and applies the two-level reduction under U.S.S.G. § 4C1.1

for qualifying zero-point offenders.[48] That is important. Mr. Martin is not simply a defendant who

---

[46] *Id.*

[47] *See United States v. Mussayek*, 338 F.3d 245, 253–54 (3d Cir. 2003) (affirming enhancement where defendant solicited enforcers, paid a down payment, supplied victim information, and arranged travel to locate victims); *United States v. Thomas*, 999 F.3d 723, 735–36 (D.C. Cir. 2021) (affirming enhancement where defendant revealed surveillance-type details showing an apparent ability to carry out the threat); *United States v. White*, No. 14-15525, slip op. at 56–58 (11th Cir. June 30, 2016) (affirming enhancement where threats were reinforced with detailed information about victims and their families).

[48] The government argues that the two-point reduction under § 4C1.1 does not apply because of §3A1.1(b)(2). *See* Gov't Sentencing Mem., Dkt. 93, p. 4; as argued above, this Guideline section is inapplicable and this Court should accept the 2-point departure under § 4C1.1 as the PSR recommends.

technically falls within Category I because of an old or minor record. He has no prior convictions at all.

That history matters under § 3553(a). It bears on the need for incapacitation, the need for specific deterrence, and the likelihood that Mr. Martin will reoffend. The Guidelines now distinguish qualifying zero-point offenders from other defendants because the Commission found that zero-point offenders present a materially different criminal-history and recidivism profile.[49] The Court should give that fact real weight.

## VI.   MR. MARTIN'S CHARACTER AND HISTORY JUSTIFY SUPERVISED RELEASE

The § 3553(a) factors further justify a sentence of supervised release. Mr. Martin does not minimize the seriousness of his conduct. § 3553(a) asks the Court to consider not only the offense, but also the history and characteristics of the defendant and the need to impose a sentence that is sufficient, but not greater than necessary. Here, the record presents substantial mitigating evidence bearing on who Mr. Martin is apart from the offense conduct, including his honorable service in the United States Marine Corps, his conduct while on pretrial release, the strong and consistent support reflected in the letters submitted on his behalf, and his significant medical condition. Taken together, these considerations support the conclusion that a sentence of

---

[49] *See* U.S. Sent'g Guidelines Manual supp. to app. C, amend. 821 (U.S. Sent'g Comm'n 2023).

supervised release is sufficient to satisfy the purposes of sentencing.

A. <u>Mr. Martin's Five-Year Honorable United States Marine Corps Service</u>

From 2007 to 2013, Mr. Martin served honorably in the United States Marine Corps and attained the rank of corporal.[50] That service does not excuse the offense, but it is a meaningful part of the history and characteristics the Court can consider under 18 U.S.C. § 3553(a)(1).[51]

B. <u>Mr. Martin's Conduct Following a Fatal Motor Vehicle Crash</u>

On March 31, 2026, while on pretrial release and driving for Uber, Mr. Martin witnessed a serious motor vehicle crash, stopped, rendered aid to an individual who had been ejected from a vehicle, performed CPR until EMS arrived, and then remained on scene to provide a witness statement to law enforcement.[52] He also promptly reported the incident to Probation, as it involved contact with law enforcement.

In Mr. Martin's witness statement to the police (attached as Exhibit B), he says he saw a Jeep strike a white semi-truck and begin rolling. He called 911 and exited his vehicle. He instantly ran to help and following the 911 operator's direction, moved a seriously injured crash

---

[50] Dkt. 80, Sealed PSR ¶ 82.

[51] *See* 18 U.S.C. § 3553(a)(1).

[52] *See* Ex. A.

22

victim out of harm's way, and administered CPR until fire and EMS personnel arrived. That conduct was not undertaken for recognition, or advantage. It was an immediate and selfless response to a traumatic emergency involving a stranger. Unfortunately, the victim died.

Mr. Martin's decision to stop, assist, remain on scene, and continue rendering aid until emergency personnel arrived reflects judgment, empathy, and a capacity for responsible action under extreme circumstances. He did not simply drive by ignoring what he'd seen.

C. The Letters Submitted on Mr. Martin's Behalf Further Reflect His History, Character, and Family Support

The letters submitted on Mr. Martin's behalf present a consistent and compelling picture of a man who, despite the seriousness of this offense, is known by family, friends, co-workers, and a pastor as a devoted father, a supportive family member, a generous friend, and a person who has shown genuine remorse and capacity for growth.[53] They repeatedly describe his service in the Marines, his steady support for his children and family, his willingness to help others without personal gain, and his positive influence in both work and personal settings, and they respectfully ask the Court to consider leniency, often specifically a non-custodial sentence, based on his character, family responsibilities, and demonstrated rehabilitation potential.

---

[53] *See* Ex. A.

D. Mr. Martin's Physical Condition

Mr. Martin has prior spinal injuries sustained during military training. He suffers from two L5-S1 spinal fusion procedures, chronic lower-back pain, continuing numbness in his legs. Additionally, he was in treatment for tuberculosis extending into April 2026.[54] Mr. Martin does not contend that these circumstances excuse his conduct. He submits only that they are relevant to the Court's assessment of what sentence is sufficient, but not greater than necessary. A term of imprisonment would carry an obvious risk of aggravating already serious physical limitations and complicating ongoing treatment, and the Court may properly account for that practical reality in fashioning a just sentence.

## VII.   A SENTENCE OF SUPERVISED RELEASE WILL PROVIDE JUST PUNISHMENT AND ADEQUATE DETERRENCE

The sentence imposed must be proportionate to this defendant and to the record before the Court, not to the broadest conceivable measure of harm. Section 3553(a) requires the Court to impose a sentence that is sufficient, but not greater than necessary, after considering the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to provide just punishment, adequate deterrence, and protection of the public.[55] The government's reliance on general deterrence does not alter the individualized

---

[54] Dkt. 80, Sealed PSR ¶ 73.

[55] *See, e.g., United States v. Rosales-Bruno*, 789 F.3d 1249, 1259–60 (11th Cir. 2015) (recognizing the central role of the defendant's history and characteristics in the sentencing analysis).

24

analysis required by § 3553(a). Deterrence is one factor, but it does not justify unsupported enhancements. The government's broader claim that this case "corrodes" trust in the cyber-incident response industry is a policy assertion, not a case-specific sentencing fact about Mr. Martin, and it should not be allowed to displace the required focus on the actual record before the Court.

A sentence of supervised release is appropriate here. Such a sentence would not minimize the seriousness of the offense or the significance of Mr. Martin's conviction. He stands convicted of a serious federal felony, has accepted responsibility, has agreed to a forfeiture money judgment of $324,123.26, and remains subject to mandatory restitution and the continuing consequences of a federal felony criminal conviction. A sentence of supervised release would therefore impose real punishment and real accountability, while also accounting for the individual circumstances that distinguish Mr. Martin from a more aggravated offender, among them, that he did not occupy the top tier of the criminal structure, did not personally receive anything approaching the intended-loss figure that drives the advisory range, has forfeited the proceeds traceable to his offense, did not attempt to flee and turned himself in, has cooperated with the government, and has remained compliant while on release.

The Court may also properly consider the substantial collateral consequences that already attach to this case. A conviction of this nature carries serious professional, financial, and reputational consequences that will continue long after sentencing. Those consequences do not

replace punishment, but they are part of the actual sanction Mr. Martin now faces and are relevant to the Court's determination of what sentence is necessary to achieve just punishment.

Specific deterrence is likewise less pressing here than in many federal cases. Mr. Martin has no prior criminal record, qualifying him as a zero-point offender. There is no indication in this record that he engaged in violence, obstructed justice, attempted to flee, or violated any condition of release after being charged. To the contrary, while on release he has remained compliant and, on March 31, 2026, stopped at the scene of a serious crash, rendered aid to an ejected victim, performed CPR until EMS arrived, and remained to provide a witness statement to police. In these circumstances, the combination of prosecution, conviction, forfeiture, restitution, and a term of supervised release is sufficient to deter future misconduct and protect the public without imposing a sentence greater than necessary.

## VIII.   MR. MARTIN PRESERVES HIS PSR AND GUIDELINES OBJECTIONS

Mr. Martin preserves and incorporates his previously filed objections under Rule 32(f), as addressed in the Addendum to the Presentence Report, including his objections to the application of U.S.S.G. § 2B3.2(b)(3)(B), the attribution of approximately $16.3 million in intended loss, and PSR descriptions that overstate his authority, independence, and decision-making role.[56]

---

[56] Dkt. 77 (Feb. 19, 2026); Dkt. 80, Sealed PSR; Dkt. 86, Sealed Addendum to PSR.

Mr. Martin does not request that the Court make granular findings on each disputed Guidelines issue in order to impose sentence. To the extent Fed. R. Crim. P. 32(i)(3)(B) requires resolution of any controverted matter, Mr. Martin respectfully requests findings only as to those matters on which the Court intends to rely in selecting sentence, or, alternatively, a determination that the disputed matter will not affect sentencing or will not be considered.

## CONCLUSION

For the foregoing reasons, Mr. Martin respectfully requests that the Court reject the government's proposed enhancements under U.S.S.G. §§ 3A1.1(b)(1) and (b)(2), reject the PSR's proposed three-level increase under U.S.S.G. § 2B3.2(b)(3)(B)(iv), (v), and impose a sentence of three years of supervised release, together with the agreed forfeiture money judgment of $324,123.26, the mandatory $100 special assessment, and restitution as determined by the Court.

Respectfully submitted,

/s/ William Aaron Daniel
William Aaron Daniel (FL Bar No. 99739)
Asymmetric Legal
11900 Biscayne Blvd., Suite 400
Miami, FL
t:  (305) 979 - 9296
aaron@asymmetric.legal

*Designated Local Counsel for Defendant Kevin Martin*

/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
Tor Ekeland Law, PLLC
30 Wall St., 8th Floor
New York, NY
10005
t:  (718) 737 - 7264
tor@torekeland.com

*Pro Hac Vice Counsel for Defendant Kevin Martin*

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 25-CR-20443-KMM

UNITED STATES OF AMERICA

      Plaintiff,

      v.

RYAN CLIFFORD GOLDBERG and
KEVIN TYLER MARTIN,

      Defendants.

_____

**<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that on this 23rd day of April, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

29

Respectfully submitted,


/s/ William Aaron Daniel
William Aaron Daniel (FL Bar No. 99739)
Asymmetric Legal
11900 Biscayne Blvd., Suite 400
Miami, FL
t:  (305) 979 - 9296
aaron@asymmetric.legal

*Designated Local Counsel for Defendant Kevin Martin*


/s/ Tor Ekeland
Tor Ekeland (NYS Bar No. 4493631)
Tor Ekeland Law, PLLC
30 Wall St., 8th Floor
New York, NY
10005
t:  (718) 737 - 7264
tor@torekeland.com

*Pro Hac Vice Counsel for Defendant Kevin Martin*

30