UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 25-CR-20443-MOORE

UNITED STATES OF AMERICA,

     Plaintiff,

v.

RYAN CLIFFORD GOLDBERG,

     Defendant.

_____/

## RYAN GOLDBERG'S MEMORANDUM IN AID OF SENTENCING

Ryan Goldberg, through undersigned counsel, submits this Memorandum in Aid of Sentencing, in advance of his sentencing scheduled for April 30, 2026.

### I.    History and Characteristics of the Defendant

Before Mr. Goldberg's involvement in this offense, he spent years as a law-abiding citizen who selflessly served the United States. In 2003, when he was just 18, Mr. Goldberg joined the United States Air Force. PSI ¶ 62. Between 2003 and 2007, Mr. Goldberg was active duty stationed in Florida, reaching the rank of Senior Airman (E4). During his active duty, he was deployed to Iraq between September 2004 and February 2005 to assist in establishing Logistics Support Area Anaconda, later known as Balad Air Base, which opened in Iraq in 2003. The newly established air base was subject to frequent attacks during Mr. Goldberg's deployment. Enemies attacked the base so often that it earned the nickname "Mortaritaville" because of the

1

frequency of mortar and rocket attacks. [1] Mr. Goldberg, at just 19 years old, experienced multiple violent attacks during his deployment, including witnessing his friend, Senior Airman Kolfage, lose both legs and his right hand during a rocket strike.

In 2007, Mr. Goldberg was honorably discharged from the miliary, years later receiving a 50% disability benefit due to Post Traumatic Stress Disorder from his deployment. Notwithstanding the violence he experienced, Mr. Goldberg remained motivated to continue serving. In 2007, shortly after his discharge, Mr. Goldberg returned to Iraq, this time as a civilian contractor with ITT Systems. This time, Mr. Goldberg worked as a network administrator, building servers, resolving network issues, and ensuring that the base technology functioned properly.

Mr. Goldberg excelled and soon took on additional training to become skilled in combat forensics. In 2008, Mr. Goldberg transitioned into a combat forensics role overseen by the Defense Intelligence Agency, all while still living full time in Iraq. In this role, Mr. Goldberg was tasked with analyzing information from computers, phones, and other devices that ground troops recovered from enemy targets during missions. Mr. Goldberg's forensic analysis, aside from being time consuming and technically advanced, also involved repeated exposure to violent material. The recovered devices often included videos of enemies beheading civilians, burning

---

1 Leef Smith, *In Iraq, Race Brings Touch of the Familiar*, Washington Post (Oct. 24, 2004), available at https://www.washingtonpost.com/archive/local/2004/10/25/in-iraq-race-brings-touch-of-the-familiar/aaffcc39-0996-4a1a-9bc8-3f20c3fada53/.

people alive, or other means of torture for enemy use in propaganda or blackmail. Mr. Goldberg viewed this raw material day in and day out to identify enemies from the footage and support the ground troops with capture efforts. He did so without question and without complaint. Mr. Goldberg directly supported the 1st Brigade Combat Team, 1st Armored Division (Ready First"), the 4th Infantry Division ("Ivy Division"), the 82nd Airborne Division ("All American"), and Combined Joint Special Operations Task Force Arabian Peninsula, among others. [2] Highlights of Mr. Goldberg's service from this time include the following:

- In April 2009, Mr. Goldberg's forensic review of an enemy combatant's cell phone uncovered the location of a kidnapped 11-year old boy, the son of an Iraqi colonel, through Mr. Goldberg's GPS analysis of the phone.

- In October 2009, Mr. Goldberg's analysis of an enemy computer resulted in the recovery of $1.9 million US dollars from an enemy financer in Baghdad.

- Throughout his deployment, Mr. Goldberg assisted in training the Iraq Counter Terrorism Service by teaching computer forensic techniques.

In 2010, Mr. Goldberg returned to the United States for a brief sabbatical, but his drive to serve the nation continued. After less than one year home, Mr. Goldberg

---

[2] *See generally*, Defense Intelligence Agency History Office, *DIA's Crucial Role in Operation Iraqi Freedom*, (March 18, 2015), available at https://www.dia.mil/News-Features/Articles/Article-View/Article/580879/dias-crucial-role-in-operation-iraqi-freedom/.

again deployed in 2011, this time to Afghanistan. Mr. Goldberg contracted under the National Ground Intelligence Center, this time as a battlefield combat forensic analysist. Mr. Goldberg lived full time on the military base (Camp Nathan Smith) and worked in the field with combat troops gathering forensic evidence. His support was especially critical in these months given his deployment's timing around the death of Osama bin Laden on May 2, 2011, and the additional attacks that American troops faced during that period.[3] During this tour, Mr. Goldberg supported the 2nd Brigade Combat Team, the 2nd Infantry Division, the 4th Infantry Division, as well as Central Intelligence Agency and the Defense Intelligence Agency. Once again, Mr. Goldberg witnessed extreme violence, both through his forensic analysis and while in the combat field, including witnessing the death of his friend Brittany Gordon, who was slaughtered by a suicide bomber. In total, Mr. Goldberg participated in **over 60 field missions**, bravely placing his life on the line each time.

For anyone, service of this caliber should be commended, but even more so for Mr. Goldberg. Not only did Mr. Goldberg have to overcome the pressure of his parents' expectations, but he also overcame the sting of emotional and physical abuse and instability during his formative years. Mr. Goldberg's father was a perfectionist to a fault. Mr. Goldberg recalls being beat with a belt when he did not meet his father's

---

3 *See generally*, John J. Mortimer Jr., United States Army Center of Military History, *The Afghan Surge, January 2009 -August 2011* (2023), available at https://history.army.mil/Publications/Publications-Catalog/The-Afghan-Surge-The-US-Army-In-Afghanistan/.

expectations, or being called degrading names like "dumb n\*\*\*\*" when he made mistakes. PSI ¶ 59. His father's career also meant that the family moved frequently, living in Texas, Germany, Puerto Rico, Tennessee, North Carolina, and Iowa, all before Mr. Goldberg had turned 18. PSI ¶ 59. Moreover, when Mr. Goldberg was just ten years old, a neighbor in Tennessee sexually molested Mr. Goldberg. PSI ¶ 61. Mr. Goldberg carried all these experiences with him when he chose to join the military at the raw age of 18, and throughout each time that he repeatedly chose to protect and serve his country thereafter.

Mr. Goldberg's history and characteristics demonstrate that he is a person who is resilient and holds conviction for doing what is right. Notwithstanding his involvement in this conspiracy, Mr. Goldberg has demonstrated since his arrest that he will do whatever it takes to correct his mistakes. Mr. Goldberg has been actively engaging in mental health treatment at the Federal Detention Center. He has been attending religious services regularly. He has also started an informal resource group at the Federal Detention Center for inmates to research lawful job opportunities, trade schools, and professional certifications for convicted felons.

Mr. Goldberg also has outstanding support in the community. With this Memorandum, Mr. Goldberg submits the words of his family and friends who know him best. *See* Notice of Letters in Aid of Sentencing, DE 96. They describe him as someone who gives "unconditional love" "who "believes in hard work, respect, and responsibility" and who has a strong sense of "duty, discipline, and sacrifice." DE 96

at 3, 15, 24. Those who served with him in the military describe him as someone "determined to complete any mission regardless of danger or difficulty." DE 96 at 7. Mr. Goldberg has a wealth of support waiting for him upon his release, and he will no doubt be accepted back with open arms. This support provides further evidence that Mr. Goldberg's involvement in this offense is an aberration from his true character. *See* Notice of Letters in Aid of Sent., DE 96.

## II.    Nature and Circumstances of the Offense

Mr. Goldberg has pleaded guilty to one count of Conspiracy to Commit Hobbs Act Extortion, in violation of 18 U.S.C. § 1951(a). His conviction stems from his participation in ransomware attacks through the ALPHV/BlackCat ransomware group after over a decade working in both the public and private sector in cybersecurity and service to the nation. As Mr. Goldberg will tell the Court at sentencing, the irony that he became the very threat he worked for years to fight against is not lost on him, and he understands the severity of his conduct given his background.

That said, the Court should consider the limited role that Mr. Goldberg played in the larger ALPHV/BlackCat conspiracy. The ALPHV/BlackCat conspiracy extends much beyond Mr. Goldberg and his co-conspirators. Mr. Goldberg did not develop the ransomware. Mr. Goldberg did not act as an administrator on the ransomware. Mr. Goldberg was not aware of, nor did he agree to participate in the activities of the larger ALPHV/BlackCat conspiracy. His participation was limited to the five attacks

listed in the Offense Conduct between May 2023 and April 2025, and he is clearly at the bottom of the larger conspiracy network. *See* PSI ¶¶ 20–32. Even as compared to Martin and Co-Conspirator 1, Mr. Goldberg was the least culpable of the three. Mr. Goldberg provided initial "access" into networks that the trio hacked, but he was not involved in identifying victims, exfiltrating data, communicating with victims, or handling payments, as his co-conspirators did. PSI ¶ 33.

Additionally, the Court should consider that the loss amount in this case overstates the seriousness of the offense. While the guidelines accurately account for the intended loss, *i.e.*, the money that the defendants were hoping to gain, because only one victim paid the ransom, the actual loss is much lower, at $1,200,000. PSI ¶ 30. Mr. Goldberg's profit from the scheme was even smaller than that: between $200,000 and $300,000. PSI ¶¶ 24, 30. This too demonstrates that while the offense is serious, the guideline range here over-captures the harm.

## III.    Need to Avoid Disparity, Need for Sentence Imposed, & Kinds of Sentences Available

As to the need to avoid sentencing disparities, the Court should consider the data for similarly situated defendants. Should the Court apply the United States Probation Office's recommended guidelines at a total offense level 25, the Judiciary Sentencing Information data provides that the average length of imprisonment imposed is 43 months, and the median length of imprisonment imposed is 46 months. *See* United States Sentencing Commission, Judiciary Sentencing Information,

available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (criminal select history category I, offense level 25, guideline § 2B3.2) A sentence substantially greater than these numbers would promote a disparity between defendants convicted of similar conduct.[4]

Also relevant to disparities, the Court should also consider that Co-Conspirator 1 appears to *not even have been arrested*. While both Mr. Goldberg and Martin have pleaded guilty, accepted responsibility for their conduct, and worked with the Government to correct their actions, no such consequences have come for Co-Conspirator 1. In evaluating sentencing disparity, this is concerning given that Co-Conspirator 1 clearly had the largest role amongst the three conspirators. Co-conspirator 1 was the person responsible for negotiating the payout directly with the Victims. He had a background in ransomware negotiating and initiated the most direct threats with the victims. While Mr. Goldberg and Martin have taken accountability for their actions, Co-Conspirator 1 walks free—seemingly not even charged.

As for the need for the sentence imposed and the kinds of sentences available, Mr. Goldberg requests also that the Court consider this sentencing factor in conjunction with his history and characteristics. He is not similarly situated to most defendants. He comes with over a decade of service to the nation in some of the most

---

4 Mr. Goldberg maintains his objections that the total offense level should be 22, with corresponding guidelines of 41 – 51 months. The JSIN data for an offense level 22 has an insufficient number of defendants for comparison.

turbulent parts of the world having experienced more violence and trauma than most will see in a lifetime. This background is not only mitigating to his participation in the offense, but it also shows the Court that a long sentence is not needed for this defendant. Mr. Goldberg's years of service and lawfulness have already demonstrated that he has the discipline, values, and resilience to succeed in the community and not be back before this Court.

## IV.   Recommendations to the Bureau of Prisons

Mr. Goldberg respectfully requests that the Court recommend that he serve his sentence at Federal Correctional Institution Jessup to be near his wife and family. He further requests that the Court recommend participation in the RDAP program.

Respectfully Submitted,

HECTOR A. DOPICO
FEDERAL PUBLIC DEFENDER

BY:   *s/ MaeAnn Dunker*
MaeAnn Dunker
Assistant Federal Public Defender
Special A# A5502960
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 530-7000
Email: maeann_dunker@fd.org

9

## CERTIFICATE OF SERVICE

I HEREBY certify that on **April 27, 2026**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   *s/ MaeAnn Dunker*
      MaeAnn Dunker

10